**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CARL FOSTER, | |
| Plaintiff, | Civil Action No. 11-1931 (BAH) |
| v. | Judge Beryl A. Howell |
| RAY MABUS, *Secretary of the Navy, et al.*, | |
| Defendants. | |

**<u>MEMORANDUM OPINION</u>**

Pending before the Court are cross-motions for summary judgment from the defendants,

the Secretary of the Navy and the Commanding General of the U.S. Marine Corps' Training and

Education Command ("TECOM"), and from the plaintiff, retired Marine Corps Master Sergeant

Carl Foster.  Defs.' Mot. Dismiss or, alternative, Mot. Summ J. ("Defs.' Mot.") at 1, ECF No.

34; Pl.'s Mot. Summ. J. on Admin. R. ("Pl.'s Mot.") at 1, ECF No. 35.  This is the second round

of summary judgment motions filed by these parties concerning the Marine Corps' decision to

decertify the plaintiff as an instructor in the Marine Corps Junior Reserve Officers Training

Corps ("MCJROTC"), after the first round resulted in summary judgment for the plaintiff and

remand for further consideration by the defendants.  *See Foster v. Mabus* (*Foster I*), 895 F. Supp.

2d 135, 148 (D.D.C. 2012).  For the reasons set forth below, the plaintiff's motion for summary

judgment is again granted and the defendants' motion is again denied.

**I.     BACKGROUND**

The general facts of this case were set out in *Foster I*.  895 F. Supp. 2d at 138–143.  The

defendants' decertification decision under review in *Foster I* did not necessitate a detailed

examination since the motions were resolved based on the simple fact that the defendants offered

virtually no explanation for the action taken. *Id.* at 147. Thus, a more fulsome description of those circumstances is presented below to give context to the instant decision. That discussion is followed by a summary of the holdings in *Foster I*, and the post-*Foster I* procedural history.[1]

### A.    Factual Background

From 1999 through 2010, the plaintiff was a certified MCJROTC instructor at Amite High School in Amite, Louisiana. *Foster I*, 895 F. Supp. 2d at 138, 141. The Junior Reserve Officers' Training Corps is a military service program in high schools throughout the nation, sponsored by the Armed Forces. *See* 10 U.S.C. § 2031. The plaintiff was an alumnus of Amite High School and was teaching there after his retirement from a lengthy career in the Marine Corps. Administrative Record ("AR") at 301, ECF No. 6.[2] Prior to the 2009–2010 school year, he received uniformly perfect performance evaluations, with "Outstanding" ratings in every category on every evaluation during that ten year period. AR at 183–201. The plaintiff's streak of perfect evaluations came to an end in 2009 when he began to serve under a new Senior Marine Instructor ("SMI"), Lt. Col. Ronald Bias. AR at 180.

Bias and the plaintiff appear to have clashed almost from the beginning of their working relationship. *See* AR at 156. Bias was recalled to the Marine Corps' Active Reserve on August 1, 2009, with an assignment to the MCJROTC program at Amite High School. AR at 370. The plaintiff contends that this recall to active duty was necessary because Bias had secured retirement prematurely and needed to serve an additional sixteen months to be eligible for

---

[1] The plaintiff initially filed suit based on his decertification as a Navy JROTC instructor as well as an MCJROTC instructor. *See generally* Compl., ECF No. 1. The plaintiff subsequently withdrew his claims against the Navy since the plaintiff was recertified by the Navy as a JROTC instructor, but continues to pursue his claims against the Marine Corps. Part. Mot. Dismiss Rear Admiral David F. Steindel at 1, ECF No. 28. Consequently, only those facts related to the plaintiff's MCJROTC certification are discussed.

[2] The Administrative Record ("AR") consists of the materials reviewed by the Marine Corps prior to *Foster I* as well as two supplemental submissions regarding the reconsiderations after *Foster I*, the Supplemental Administrative Record ("SAR"), ECF No. 31, and the Second Supplemental Administrative Record ("2SAR"), ECF No. 39. All page citations refer to the "Bates stamp" number located at the bottom of the page of the relevant portion of the AR.

retirement.  Pl.'s Mem. Supp. Pl.'s Mot. ("Pl.'s Mem.") at 2, ECF No. 35-2.  The plaintiff "immediately expressed reservations concerning this situation and orally complained about an active duty officer being assigned to this position."  *Id.*  Indeed, the assignment, during war-time, of an active duty Marine Corps Lieutenant Colonel to teach at a high school in a small town in Louisiana eventually was questioned by the Marine Corps' highest ranking non-commissioned officer.  AR at 12 (Email from Sergeant Major of the Marine Corps Carlton W. Kent to subordinates asking "how can a LtCol [sic] be augmented back to active duty [to] be an instructor at a high school?").[3]  As the plaintiff notes, after Bias was recalled to active duty, the "professional relationship [between Bias and the plaintiff] and [Bias'] relationship with the school administration started deteriorating."  AR at 358.

Just over a month after Bias was recalled to active duty, the plaintiff took a group of MCJROTC cadets and non-cadets, all of whom were members of the Amite High School cross-country team, to a training exercise at Elgin Air Force Base in Destin, FL.  Suppl. AR ("SAR") at 41, ECF No. 31.  The majority of the students were MCJROTC cadets, but some were not, though they were targeted for recruitment into the program.  *Id.* at 43.  The day after the plaintiff left with the students for Florida, Bias sent an email to the Regional Director for the MCJROTC program, Lt. Col. Mark. H. Stroman, stating Bias "need[ed] to research an ugly rumor," and requesting confirmation as to whether Amite High School had any "requests for MCJROTC travel expenses (vehicle, lodging, or meals) for a trip this weekend?"  AR at 153 (Sept. 11, 2009 email from Bias to Stroman).  The plaintiff contends that Bias was fully briefed on the trip and that all of the paperwork was approved by TECOM.  SAR at 44.  The record contains an email,

---

[3] The Sergeant Major of the Marine Corps is equivalent to a "three-star general officer" and serves as an advisor to the Commandant of the Marine Corps.  History, Sergeant Major of the Marine Corps, http://www.hqmc.marines.mil/smmc/History.aspx. (last visited Apr. 28, 2015).

dated August 17, 2009, from Bias to Stroman, forwarding a schedule of training events for Amite's MCJROTC. AR at 368–69. Notably, the first of the ten listed "training events" is "NCO TRNG" to take place in September 2009 in Destin, FL. *Id.* at 369.

Bias' September 2009 email to Stroman triggered a Preliminary Investigation into the trip, conducted by Stroman. SAR at 40–42. Stroman's investigation revealed that five students on the trip were not MCJROTC cadets, *id.* at 41; that the plaintiff was, at the time, the school's Cross Country coach, *id.*, and that the training on the trip consisted of "running on trails, workouts on tracks and runs on the beach," *id.* at 42. Stroman opined that "[t]here was zero leadership training or any MCJROTC training conducted during the trip . . . and that [the plaintiff] was in the wrong to attempt to pay for this trip with government funding." *Id.* at 42. Stroman recommended that the matter "be referred to the judge advocate to determine if the amount of money requested meets the threshold for further action by the Marine Corps." *Id.*

After completing his investigation, Stroman made clear his decision that he wanted the plaintiff removed from his position. In response to several questions raised by the TECOM Senior Judge Advocate ("SJA"), Stroman stated in an October 24, 2009 email that he had not "require[d] a statement" from Bias as part of Stroman's investigation, but that he would seek such a written statement and submit it with Stroman's investigation summary.[4] AR at 32. Stroman stated his belief that the plaintiff "violated all the things we are attempting to teach the cadets about honest [sic], integrity, decision making and being good citizens." *Id.* Based on this belief, Stroman stated to the MCJROTC Director, Dr. William McHenry ("McHenry"), that he planned to remove the plaintiff from his position regardless of whether the TECOM Commanding General opted to decertify the plaintiff based on the Florida trip. *Id.*

---

[4] No written statement from Bias regarding the Florida trip appears in the record.

Stroman wrote that "[s]hould the CG decide not to decertify MSgt Foster, then so be it.  I will make sure that the MSgt gets a letter of reprimand and an unsat [sic] eval [sic] at the end of the year."  *Id.* (referring, presumably, to an "unsatisfactory evaluation").  Stroman promised to "make sure to visit [the plaintiff] everytime [sic] [Bias would] go to Louisiana and make him [Bias'] next science experiment."  *Id.*  After noting that the plaintiff's instructor certification expired in February 2011, Stroman stated that he would "never recommend [the plaintiff] for recertification and we can be rid of him in 15 months if the CG does not take action against him now."  *Id.*  Stroman concluded by noting he would not be visiting Amite High School during an upcoming trip to Louisiana because he "wanted to avoid any questions from the Principal while this [matter] was in limbo."  *Id.*

In late October 2009, while the Commanding General's recommendation was pending, Bias reported to Stroman that Amite High School's Principal had been informed the school would need to reimburse MCJROTC for the cost of the Florida trip.  AR at 58.  Consistent with this explicit direction not to use MCJROTC operational funds to pay for the trip, the Principal approved an expenditure from the MCJROTC fundraising account, a separate account maintained by the school over which the MCJROTC program did not have direct control.  *Id.*  As a result, government funds were not expended on the Florida trip, but rather funds earned by MCJROTC cadets through fundraisers to support the program.  *See id.*  Stroman expressed a strong reaction to the Principal's choice for funding the Florida trip, stating that he viewed the action as grounds for "shutting this program down."  *Id.*  Based on the Principal's action, Stroman appealed to McHenry in an email for "[a]ny sense of urgency we can get on decertification of the [plaintiff]."  *Id.*

As a result of Stroman's investigation and recommendation, McHenry forwarded a final decertification package to TECOM, which would have resulted in the plaintiff's removal as an MCJROTC instructor. AR at 291. In January 2010, the Commanding General determined not to decertify the plaintiff and the plaintiff's "status as a certified instructor [was] to remain intact for the time being." *Id.* Denied his request to decertify the plaintiff, Stroman proceeded to provide the plaintiff with a "Counseling Statement" on January 28, 2010, setting out certain requirements the plaintiff had to fulfill to remain certified. *Id.*

The counseling statement noted that the plaintiff had "been given an opportunity to retain [his] position," but made clear that such retention was conditioned on meeting the following requirements: First, the plaintiff was "to perform [his] duties in a manner that is subordinate to that of the Senior Marine Instructor." *Id.* The statement acknowledged that the plaintiff was "an employee of the school," but noted that his "position as the Marine Instructor is subordinate to that of the Senior Marine Instructor." *Id.* Second, the plaintiff was "no longer authorized to hold any position of authority that would allow [him] to make decisions concerning, or handle" MCJROTC funds. *Id.* "Any purchase request documents (PRDs) submitted from Amite MCJROTC" were to "be signed or initialed by the SMI." *Id.* Moreover, the plaintiff was stripped of his duties as "Responsible Officer" and "Military Property Custodian." *Id.* Third, the plaintiff was ordered to "resign from any position at the school that is not directly related to [his] responsibilities as the Marine Instructor for MCJROTC." *Id.* at 291–92. The statement specified that such resignations "would include any coaching responsibilities other than those directly related to that of the MCJROTC Drill teams or Color Guard teams." *Id.* at 292. Finally, the

statement required the plaintiff to "continue to perform all extra duties that are required of all teachers at Amite High School."[5]  *Id.*

In addition to these retention conditions, and despite the fact that TECOM's Commanding General declined to decertify the plaintiff, Stroman included punishing language in the counseling statement that the plaintiff's participation in the Florida trip was "done with full knowledge that [the plaintiff's] actions were both criminal and inappropriate."  *Id.*  As if being accused of "criminal" conduct were not enough, the counseling statement went on to chastise the plaintiff, stating that his "inability to demonstrate the Marine Corps Core values of honor, courage and commitment ha[d] been brought to the forefront as a result of [his] actions."  *Id.*  The plaintiff was cautioned that his "ability to set the appropriate example for the cadets [was] in serious question."  *Id.*  Finally, the plaintiff was told that Stroman would "not tolerate the slightest slip in performance or judgment in [the plaintiff's] actions that reflect on [his] character or the performance of [his] assigned duties as a Marine Instructor."  *Id.*  In accordance with the counseling statement, Bias provided the school principal, school purchasing agent, and the plaintiff with a memorandum stating that "any and all expenditures from MCJROTC accounts (Federal and Fundraising) require the signature of" Bias and that "[e]xpenditures not approved by [Bias] shall not receive funding from MCJROTC accounts."  AR at 290.

The next month, on February 22, 2010, the Amite Principal told the plaintiff that he "need[ed]" the plaintiff "to set up the concession stand for" a basketball game that Friday night,

---

[5] Teachers often take on roles beyond the classroom to enhance the educational experience for a school's students and to foster a sense of community, particularly when asked to do so by school administrators.  The counseling statement did not clarify how the plaintiff could be expected to adhere to the third requirement, that he "resign from any position at the school that is not directly related to [his] responsibilities as the Marine Instructor," AR at 291, while simultaneously adhering to the fourth requirement that the plaintiff "continue to perform all extra duties that are required of all teachers at Amite High School," *id.* at 292.  Indeed, the tension between these two commands was later highlighted when the plaintiff was criticized for seeking clarification as to tasks he could and could not undertake.  *See infra* p. 9.

AR at 242, with the funds to benefit the school's weightlifting program, *id.* at 237.  The plaintiff initially demurred, *id.* at 242, but eventually agreed to "provide[] support outside of any ties with the JROTC Program" at the Principal's request, *id.* at 240.  Given the obvious difficulties in reconciling the third and fourth requirements in the strongly-worded counseling statement, *see supra* n. 5, the plaintiff prudently "informed [Bias] of the request" prior to agreeing to help the Principal.  AR at 237.

Part of running a concession stand at the school involved filling out and submitting a purchase order for supplies.  *See id.*  The plaintiff had previously planned to run a concession stand earlier in February to benefit MCJROTC, but was unable to attend that event at the last minute.  *Id.*; *see id.* at 244.  The plaintiff had already prepared a purchase order for that event, dated February 9, 2010, listing JROTC as the account to be used, and merely altered the quantities on this purchase order to support the Principal's request.  *Id.* at 237; *id.* at 243 (Purchase Order, dated February 9, 2010, with four quantities scratched out and replaced with different numbers).  That Purchase Order was signed by the Principal and submitted for payment to the school's new bookkeeper.  *See id.* at 237–38.  According to the plaintiff, the signature on a school purchase order "identifies the sponsored account to be debited."  *Id.* at 238.  According to the Principal, the bookkeeper, who was new to her role, "took the funds out of [the] MCJROTC" account, in the amount of $197.50, instead of the school's general fund, which was the account authorized by the Principal's signature.  *Id.* at 295.  Indeed, the memorandum accompanying the counseling statement given to the plaintiff and provided to the school's purchasing agent made clear that only the Senior Marine Instructor, Bias, could authorize expenditures from the MCJROTC account, and a purchase order not signed by Bias could not be used to disburse MCJROTC funds.  *Id.* at 290.

In April 2010, during a review of the MCJROTC program's quarterly account statement, Bias noted the $197.50 debit to the program's funds and immediately notified Stroman, without seeking clarification from the Principal.  AR at 151.  Bias and Stroman viewed the expenditure as a "clear violation" of the plaintiff's counseling statement.  *Id.*  Stroman notified McHenry, who told Stroman "to travel to Amite and to have a meeting with the Superintendent and the Director of HR in order to bring an end to this nonsensical conduct."  *Id.*

After hearing of the debit to the MCJROTC account, the Principal "immediately replaced the $197.50 in the MCJROTC activity account . . . and sent a letter to the Superintendent . . . not[ing] that the reason the $197.50 was removed from the cadet account was because of a clerical error."  *Id.*  Stroman rejected the Principal's explanation, stating that "it was not a clerical error, but an error on the part of MSgt Foster to request the money out of the cadet account and a clear violation of the directives given to him by the SMI and the Regional Director."  *Id.*  Notably, neither the Principal nor Stroman referenced the discrepancy between the Principal's emailed request to the plaintiff to run the concession stand, on February 22, 2010, *id.* at 242, and the date on the purchase order of February 9, 2010, *id.* at 243, which discrepancy only corroborated the plaintiff's version of how the error occurred.

During Stroman's meeting with the school superintendent, Stroman opined that the plaintiff would respond to directions from Bias "to accomplish a task, [the plaintiff] would comment that it was not directed in the counseling letter" provided to the plaintiff.  *Id.* at 151; *see also supra* note 5.  Stroman advised the Superintendent that the plaintiff "was the source of the problem and would probably need to be removed from the program."  *Id.*  Stroman "recommended that [he] mediate a meeting the next day and see if [he] could get [Bias] and [the

plaintiff] on working relations again." *Id.* at 151–52.  Stroman stated that he met with the plaintiff and Bias on April 20, 2010.  *Id.* at 152.

During the meeting, the plaintiff "continually denied that he had ever done anything wrong and that he was the victim of two officers who were out to get him." *Id.*  Referring to the Florida trip, Stroman opined that the plaintiff "does not recognize his actions regarding the attempt to misappropriate government funds to pay for a Cross Country field trip as wrong." *Id.*  Stroman also stated that the plaintiff "felt that because the Principal asked [the plaintiff] to go get the concessions for the basketball game that [the plaintiff] did not need approval from the SMI in order to access MCJROTC activity account funds, in spite of having been given written guidance requiring SMI approval and signature." *Id.*  "After two hours of discussions," Stroman advised the plaintiff "that whether or not [the plaintiff] would be rehired for next year by Amite High School was solely up to [Bias] and that [Bias] would be giving his recommendation to the administration at the end of the year." *Id.*  Based on this incident, Stroman and Bias once again recommended that the plaintiff be decertified, which was forwarded to the TECOM Commanding General by McHenry.  *Id.* at 178.

In responding to this decertification request, the plaintiff noted the dysfunctional relationship between Stroman and the plaintiff and how the ongoing battle over the plaintiff's certification "stifled the progress of the Amite program." *Id.* at 155.  The plaintiff avers that the Principal "wishe[d] to have [Bias] removed" due to the "adverse conditions" between the plaintiff and Bias.  *Id.* at 156.  Specifically, the plaintiff contends that the Principal felt it to be "in the best interest of the program and the school" to remove Bias, but that recommendation ran counter to Stroman's desire to remove the plaintiff.  *Id.*  In a letter supporting the plaintiff during the decertification process, the Principal noted that attempting to decertify the plaintiff based on

the February 2010 incident "was viewed as an opportunity to launch a ruthless attack on the character and conduct of Msgt Foster." *Id.* at 160.  The Principal opined that the plaintiff's "integrity is unquestionable" and that the plaintiff was "the key to the success and progress of the Amite High School MCJROTC Program." *Id.*  In the same vein, the Principal stated that the plaintiff "is not the problem" and that "[d]ecertifying Msgt Foster would be morally unjust and would deprive this school, this program and this community of one of their most positive and influential Leaders." *Id.*

While the decertification investigation was proceeding, in May 2010, the plaintiff was given his final evaluation from Bias.  AR at 180.  Of the fourteen areas in which the plaintiff was rated, he received the highest possible rating, "Outstanding," for thirteen categories, including "cooperation," "discipline," and "professional growth." *Id.*  In the fourteenth rating area, for the "Instructor's Overall Rating," however, the plaintiff was rated "Below Average," the second lowest possible rating. *Id.*  Nevertheless, the evaluation noted that Bias "recommend[ed] reappointment of the instructor." *Id.*  In comments appended to the evaluation in July 2010, two months after the evaluation was signed by all involved, Stroman stated that he did "not concur with [Bias'] decision to recommend reappointment of [the plaintiff], but [Stroman did] understand that the Principal demanded that the mark be changed or [the Principal] would not sign the report." *Id.* at 181.  Despite the perfect evaluations that the plaintiff had received for a decade in his role as an MCJROTC instructor, Stroman expressed his opinion that "coaching is where [the plaintiff's] passion is and not MCJROTC."[6] *Id.*  He concluded that the plaintiff "should not be retained as an instructor at Amite High School or recertified," and "strongly recommend[ed] decertification at the earliest opportunity." *Id.*

---

[6] The record contains no assertion that the plaintiff failed to comply with the counseling statement's requirement that he resign from all coaching duties at the school.  *See generally* AR.

In a separate addendum, Bias wrote that the plaintiff's "performance outside his classroom duties has been unsatisfactory and has brought discredit upon himself, the Marine Corps, the school, and our unit," citing the Florida trip and the February 2010 concession stand. *Id.* at 182.  Bias stated that the plaintiff's "difficulty accepting fault/responsibility for his actions and moving forward . . . has resulted in the deterioration of professional, cooperative, and productive working relationship [sic] between SMI, MI, and principal." *Id.*  Bias noted that the plaintiff "believes himself to be a victim of unscrupulous intent on the part of SMI and Regional Director, as opposed to being held accountable for his initial actions . . . ." *Id.*  Moreover, Bias observed that the plaintiff "has taken the position of not doing anything he is not specifically instructed to undertake." *Id.*

As an example, Bias referenced, without elaboration, the plaintiff's "failure to attend a mandatory meeting with parents of cadets participating in this summer's Cadet Leadership Camp." *Id.*  While, on its face, this example might appear to support Bias' view of the plaintiff's "deteriorat[ing]" cooperation, the record contains an email from the plaintiff to Bias, dated two full weeks prior to the Cadet Leadership Camp ("CLC"), in which the plaintiff notified Bias that he would be unable to attend the trip because of "an appointment with the VA Medical Clinic" on the same day.  SAR at 56.  The plaintiff explained that "[d]o [sic] to the sensitive nature of the visit scheduling options are spaced and minimal." *Id.*  The plaintiff noted in the email that since "only one Instructor per 10 cadets was require" to attend the event, the plaintiff's absence should not have had any negative effect on the unit's attendance. *Id.*  The plaintiff "apologize[d] for the scheduling conflict." *Id.*

The day after the plaintiff sent the email to Bias explaining the necessity of his medical appointment, Stroman wrote a "Memorandum for the Record" in which Stroman stated that he

viewed the email "as evidence that MSgt Foster is willing to do whatever it takes to prevent

LtCol Bias from being successful as the SMI at Amite High School." *Id.* at 79.  Stroman

objected to "the time frame [sic] and misperception being created by MSgt Foster that this

appoint [sic] is difficult to obtain," and surmised, based on the date of the email, that the

appointment was either long-standing, and therefore should have been made known earlier, or

was recently scheduled, and therefore should have been made at another time.  *Id.*  Stroman

noted that the plaintiff was correct regarding the number of instructors required to attend the trip,

but opined that the plaintiff "knew very well that his assistance was needed in driving a school

suburban in order to get the cadets to Harlingen, Texas for the CLC." *Id.*  Although Stroman

stated that the plaintiff's "decision to wait to notify LtCol Bias, and his decision to schedule the

appointment with the VA that would preclude his participating in the CLC jeopardized the

attendance of half of the cadets," he notes that "the school district authorized the female

chaperone to drive the other vehicle, in the absence of MSgt Foster." *Id.*  Stroman did not

inquire as to the nature of the medical appointment, but stated that the appointment caused him

to "form[] opinions on the professionalism and dedication of MSgt Foster regarding his

assignment as the Marine Instructor at Amite High School." *Id.*  Stroman concluded by stating

his opinion "that MSgt Foster is not going to do what is required or expected of him as the

Marine Instructor of Amite High School and that he should not be retained by the school district

as the MI or recertified by the Marine Corps in Feb 2011." *Id.*

    Ultimately, the decertification package was presented to the TECOM Commanding

General and his staff.  *See id.* at 178.  The SJA and another staff member recommended against

de-certification.  *Id.*  Specifically, the SJA stated that "[i]n reading both MSgt Fosters [sic] &

School Principal's statements, [the SJA was] not convinced that this [February 2010 incident]

was anything more than a clerical error." *Id.* One staff member recommended "not to de-certify" without explanation, while a third recommended that the Commanding General "get Dr. McHenry up here to explain." *Id.*[7]

The TECOM Commanding General issued his decision on July 27, 2010, stating only that he had "carefully considered the information provided concerning [the plaintiff's] second misuse of funds" and that he had "determined that [the plaintiff's] continued service as a Marine Instructor with the MCJROTC Program is not in the best interests of the U.S. Marine Corps." *Id.* at 226. Consequently, the plaintiff's certification as a marine instructor was rescinded. *Id.*

### B.      The *Foster I* Decision

The plaintiff filed suit in this Court in November 2011, seeking vacatur of his decertification. Compl. at 10, ECF No. 1. The parties filed cross-motions for summary judgment and on September 29, 2012, this Court granted summary judgment to the plaintiff, denied summary judgment to the defendants, vacated the Marine Corps' decertification decision, and remanded this matter to the Marine Corps for reconsideration. Order at 1, ECF No. 18. In *Foster I*, this Court held that (1) the decision of the Marine Corps to decertify a MCJROTC instructor was subject to judicial review under the APA, *Foster I*, 895 F. Supp. 2d at 146; and (2) the Marine Corps' decision to decertify the plaintiff was arbitrary and capricious since the TECOM Commanding General failed to provide "a 'rational connection between the facts found and the choice made'" to decertify the plaintiff, *id.* at 147 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983)).

*Foster I* noted that the Marine Corps' decision was "especially problematic considering that the Marine Corps had previously chosen not to decertify the plaintiff based upon the same

---

[7] The record does not contain any further reference to whether this suggested meeting occurred.

factual finding (*i.e.*, a misuse of funds)" on which it purported to base its decision to decertify the plaintiff in July 2010. *Id.* at 147. Moreover, the decision did "not reveal whether [the Commanding General] considered the plaintiff's performance evaluations or the argument that the 'misuse of funds' was a clerical error, much less what weight they deserved." *Id.* The defendants were cautioned in *Foster I* that, although there may be "a perfectly appropriate [reason] for reaching the conclusion" to decertify the plaintiff, the Commanding General's use of "boilerplate language . . . [made] it impossible to discern." *Id.* (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995)).

C.      Post *Foster I* Procedural History

One year after the plaintiff's certification was remanded to the Marine Corps, in September 2013, this matter was reopened and the plaintiff filed an amended complaint following the Marine Corps' denial of the plaintiff's certification after reconsideration. Pl.'s Unopposed Mot. Reopen Case and for Leave to File First Am. Compl at 1, ECF No. 22. In October 2013, after the plaintiff's JROTC certification expired, the parties sought a stay while the plaintiff sought to renew his certification as a JROTC instructor and reapply for certification. Joint Mot. Stay at 1, ECF No. 25. This process resulted in two more decisions from the Marine Corps, each declining to rescind the plaintiff's decertification. SAR at 1; 2d Suppl. AR ("2SAR") at 475, ECF No. 39.

On August 13, 2014, the TECOM Commanding General issued a letter stating the grounds for his decision not to recertify the plaintiff. SAR at 1. Specifically, the letter states that the plaintiff "twice misused government funds, disobeyed an order, and displayed insubordinate behavior at being challenged for your conduct." *Id.* Consequently, according to the Commanding General, the plaintiff's "conduct was in direct contravention of [the MCJROTC]

mission and demonstrated a lack of basic discipline." *Id.*  As support for his decision, the

Commanding General repeated the allegations regarding the Florida trip and stated that the

plaintiff "violated the terms of the [plaintiff's] counseling by using MCJROTC account funds to

pay for non-MCJROTC goods in support of an Amite High School sports team fundraiser." *Id.*

at 2.  The letter states that this action was a second misappropriation of funds and a violation of

the orders contained in the plaintiff's counseling memo. *Id.* at 3.  Regarding the "clerical error"

argument, the letter states that the plaintiff's counsel's letter referencing the February 2010

concession stand events was "misleading at best" and "contradicted by the handwritten Purchase

Order dated 9 Feb 10." *Id.*  Regarding the plaintiff's allegations of reprisal and retaliation

against him by Bias and Stroman due to the plaintiff's concerns about Bias' holding the Senior

Marine Instructor position at a high school while on active duty, and the plaintiff's further

allegations that Bias had falsified a physical fitness test result, the letter stated only that "the bulk

of [the plaintiff's] statements consisted of collateral attacks on the Regional Director and the

SMI that bore no relevance to your certification." *Id.* at 3.

On October 8, 2014, the TECOM Commanding General issued a second letter because

"[i]t ha[d] come to [his] attention that matters submitted by [the plaintiff's] counsel . . . were not

specifically cited in previous decertification notification letters issued by this command," and the

Commanding General had determined to conduct a "careful consideration of all relevant

materials."  2SAR at 475.  This "careful consideration" did not lead to a different result, although

the Commanding General did consider, and reject, prior to issuing the October 2014 letter, the

results of a polygraph examination the plaintiff underwent and the results of a private

investigation conducted at the plaintiff's counsel's behest. *Id.* at 477.

16

The polygraph examination revealed that the plaintiff "answer[ed] truthfully," in the polygrapher's opinion, when he denied "intentionally tak[ing] money from the ROTC activity account for the [February 2010] fundraiser," and asserted that Lt. Col. Bias knew the group of students who participated in the cross-country trip included non-MCJROTC members.  AR at 383–84.  The private investigation, conducted by a Retired Naval Criminal Investigative Service Special Agent, concluded that the February 2010 concessions purchase order "could not have been any overt attempt to 'hide' the concession [purchase order] from Bias" and that the Principal "has admitted the transaction was an error, while [Stroman] apparently believed that [the Principal] and [the plaintiff] colluded to hide the error by the fund activity transfer in April, 2010."  *Id.* at 406.  Ultimately, the private investigator opined that "[t]here was a major leap to judgment on the part of Bias and Stroman, and it would appear this [February 2010] transaction was used as the excuse to finally decertify [the plaintiff]."  *Id.*

In reference to these two pieces of evidence, TECOM's Commanding General stated that he found "the polygraph test to be unpersuasive due to its narrow scope" and "the recommendations of MCJROTC staff, in particular the Program Director's [McHenry] recommendation . . . to be more persuasive."  2SAR at 477.  As for the alleged retaliatory motive of Stroman and Bias, the Commanding General again criticized the plaintiff for submitting "collateral attacks on the regional director and the senior marine instructor," finding that "[t]hese attacks do not speak to your ability to accomplish the mission of the MCJROTC program by serving as an example of character and citizenship for MCJROTC students."  *Id.*  The Commanding General concluded that the plaintiff "did misuse government funds and that [the plaintiff] disobeyed an order that all expenditures had to be approved by the Senior Marine Instructor (SMI) by making a purchase without prior approval from the SMI."  *Id.*

Consequently, the Commanding General found that the plaintiff's "continued certification as a Marine Instructor in the MCJROTC program is not in the best interest of the program or the Marine Corps and [the plaintiff's] certification as a Marine Instructor continues to be revoked." *Id.* at 477–78.

The parties again filed cross-motions for summary judgment, which became ripe for decision on March 6, 2015.

## II.    LEGAL STANDARD

### A.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based upon the pleadings, depositions, and affidavits and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c); *see Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). "A genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving party." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *McCready v. Nicholson,* 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases). Accordingly, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see*

*also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in APA

case, that "determining the facts is generally the agency's responsibility, not ours"); *Sierra Club*

*v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Under the APA . . . the function of the

district court is to determine whether or not as a matter of law the evidence in the administrative

record permitted the agency to make the decision it did.") (quotation marks and citation

omitted)).  Judicial review is limited to the administrative record, since "[i]t is black-letter

administrative law that in an [Administrative Procedure Act] case, a reviewing court should have

before it neither more nor less information than did the agency when it made its decision." *CTS*

*Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted;

alteration in original); *see* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those

parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985)

(noting when applying arbitrary and capricious standard under the APA, "'[t]he focal point for

judicial review should be the administrative record already in existence . . . .'" (quoting *Camp v.*

*Pitts,* 411 U.S. 138, 142 (1973))).

### B.      Administrative Procedure Act

Under the APA, a reviewing court must set aside a challenged agency action that is found

to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law,"

*id.* § 706(2)(D); *Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120–21 (D.C. Cir. 2014)

(citing *Fabi Constr. Co. v. Sec'y of Labor*, 370 F.3d 29, 33 (D.C. Cir. 2004)). The arbitrary or

capricious provision, under subsection 706(2)(A), "is a catchall, picking up administrative

misconduct not covered by the other more specific paragraphs" of the APA. *Ass'n of Data*

*Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.* (*ADPSO*), 745 F.2d 677,

683 (D.C. Cir. 1984) (Scalia, J.).

      The scope of review under the "arbitrary and capricious standard is 'highly deferential,'"

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir.

2013) (quoting *Am. Wildlands v. Kempthorne,* 530 F.3d 991, 997 (D.C. Cir. 2008)); *Envtl. Def.

Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981) (same),  and "narrow," such that "a

court is not to substitute its judgment for that of the agency," *Judulang v. Holder*, 132 S. Ct. 476,

483 (2011); *see also Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d

1127, 1135 (D.C. Cir. 2014) (same); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir.

2013) (same).  Particularly when "an agency has acted in an area in which it has 'special

expertise,' the court must be particularly deferential to [the agency's] determinations."  *Sara Lee

Corp. v. Am. Bakers Ass'n Ret. Plan,* 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. &

Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988)).  Yet, "courts

retain a role, and an important one, in ensuring that agencies have engaged in reasoned

decisionmaking." *Judulang*, 132 S. Ct. at 483–484. Simply put, "the agency must explain why it

decided to act as it did."  *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

      In evaluating agency actions under the "arbitrary and capricious" standard, courts "must

consider whether the [agency's] decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment."  *Marsh v. Ore. Natural Res. Council,* 490 U.S.

360, 378 (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton

Park, Inc. v. Volpe* (*Overton Park*)*,* 401 U.S. 402, 416 (1971), *overruled on other grounds by

Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Blue Ridge Envtl. Def. League v. Nuclear

Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013).  When an agency "'fail[s] to provide a

reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo

its action.'"  *Cnty. of Los Angeles v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting

*BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.-*

*Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "'an

agency's failure to state its reasoning or to adopt an intelligible decisional standard is [] glaring []

we can declare with confidence that the agency action was arbitrary and capricious'" (quoting

*Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994))).  At the very least, the agency must have

reviewed relevant data and articulated a satisfactory explanation establishing a "rational

connection between the facts found and the choice made."  *See Am. Trucking Ass'ns, Inc.,* 724

F.3d at 249 (quoting *State Farm,* 463 U.S. at 43); *see also EPA v. EME Homer City Generation,*

*L.P.,* 134 S. Ct. 1584, 1602 (2014) (holding that agency "retained discretion to alter its course

[under a regulation] provided it gave a reasonable explanation for doing so"); *Amerijet Int'l, Inc.*

*v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of

administrative law is that an agency set forth its reasons for decision; an agency's failure to do so

constitutes arbitrary and capricious agency action." (internal quotation marks and citation

omitted)).  "[C]onclusory statements will not do; an agency's statement must be one of

*reasoning*."  *Amerijet Int'l Inc.*, 753 F.3d at 1350 (internal quotation marks omitted; emphasis in

original).

   Moreover, when review of an agency's action is "bound up with a record-based factual

conclusion," the reviewing court must determine whether that conclusion "is supported by

substantial evidence."  *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999) (internal quotation marks

omitted); *see also Kappos v. Hyatt*, 132 S. Ct. 1690, 1695 (2012) (affirming review of "factual

findings under the APA's deferential 'substantial evidence' standard"); *Kaufman v. Perez*, 745

F.3d 521, 527 (D.C. Cir. 2014) (noting that agency factual findings may be "set aside . . . 'only if unsupported by substantial evidence on the record as a whole.'" (quoting *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176, (D.C. Cir. 2007))); *Dillmon v. NTSB*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (noting that agency's factual findings may be adopted "as conclusive if supported by substantial evidence . . . even though a plausible alternative interpretation of the evidence would support a contrary view" (internal quotation marks omitted)).

Notably, "an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706," as does ignoring "evidence contradicting its position." *Butte County*, 613 F.3d at 194. As the D.C. Circuit explained, an agency decision "would be arbitrary and capricious" if is not "supported by substantial evidence" because "'it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense.'" *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (quoting *ADPSO*, 745 F.2d at 684)). Consequently, when assessing whether agency action is arbitrary or capricious, "in their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same." *ADPSO*, 745 F.2d at 683; *accord CTS Corp.*, 759 F.3d at 59 n.1.

## III.   DISCUSSION

In the instant matter, since the Marine Corps' decision is under review pursuant to the APA, the Court is not free "to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Deference must be given to the Marine Corps, even when "reasonable minds could reach different conclusions." Defs.' Mem. Supp. Defs.' Mot. ("Defs.' Mem.") at 16, ECF No. 34 (citing *Calloway v. Harvey*, 590 F. Supp. 2d 29, 35 (D.D.C. 2008)). The record indicates that the atmosphere at Amite High School between Bias and the plaintiff was fraught with tension and

each side accuses the other of covering up for perceived improprieties.  The Court need not get to the bottom of what really happened at Amite High School—that is the role of the agency responsible for the MCJROTC program.  Nevertheless, "the principle has its limits.  Deference does not mean acquiescence."  *Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 508 (1992).  The D.C. Circuit has rejected agency determinations under APA's substantial evidence standard when, for instance, an agency fails to respond adequately to meritorious arguments raised in opposition to the agency's action.  *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1136–38 (D.C. Cir. 2013) (rejecting agency rule under APA substantial evidence standard where group challenging rule presented credible evidence contrary to agency findings and agency offered only "mere assertion" that rule accounted for contrary evidence in reply); *Butte Cnty.*, 613 F.3d at 194 (rejecting agency finding under APA substantial evidence standard where agency failed to "articulate a satisfactory explanation" and agency "ignore[d] evidence contradicting its position"); *Dilmon*, 588 F.3d at 1091 (rejecting agency decision as unsupported by substantial evidence where agency failed to offer "compelling reason for refusing to believe [the plaintiff]" and overturn previous factfinder's credibility determination).

It is far from clear that "substantial evidence" exists in the record that the February 2010 incident on which the plaintiff's decertification was based was anything more than a clerical error.  The Marine Corps' factual conclusion—on which the agency predicated the challenged decertification decision—that this incident amounted to a failure to obey orders and a "second" misappropriation of funds is tenuous at best.  Thus, the challenged decision could, arguably, be reversed solely on the ground that substantial evidence does not support its underlying factual conclusion that the plaintiff misappropriated funds or disobeyed orders.  *See Butte Cnty.*, 613 F.3d at 194.

The Court need not make such a finding, however, since the defendants' decision suffers from a more glaring procedural flaw: the record makes clear that the agency has "entirely failed to consider an important aspect of the problem" before it, namely, Stroman and Bias' documented predisposition against the plaintiff, prompted, at least in part, by the plaintiff's critical reports about Bias. *Am. Wildlands,* 530 F.3d at 998.  As a result, the agency's decision must be set aside, again.

As a threshold matter, the defendants argue that "the policies at issue" in this case "are inherently operational" in nature, meaning the Court should grant even greater deference to the defendants' decision than normally afforded under the APA.  Defs.' Opp'n Pl.'s Mot. ("Defs.' Opp'n") at 5, ECF No. 41.[8]  According to the defendants, determining "who will be certified directly influences whether the objective of the MCJROTC program will be achieved," imbuing this "certification determination" with "an operational objective." *Id*. at 5–6. The plaintiff counters that the decision whether to certify a retired Marine Corps non-commissioned officer to teach a high school program is hardly the type of "operational decision" for which the armed forces are due particular deference since "[t]he JROTC program, while helping to inculcate military knowledge and values into teenagers, is no more operational than the Boy Scouts.  Its members are not sworn, not subject to the Uniform Code of Military Justice and not used in any way to actively or passively support operational forces."  Pl.'s Reply Defs.' Opp'n Pl.'s Mot. ("Pl.'s Reply") at 2, ECF No. 45.[9]

---

[8] The defendants are correct that the plaintiff's reliance on *Adair v. England*, 183 F. Supp. 2d 31, 50–52 (D.D.C. 2002), which addressed the application of traditional strict scrutiny First Amendment jurisprudence to the unique context of military life, is misplaced. The instant matter does not involve a First Amendment dispute, making *Adair* inapposite.

[9] Indeed, as previously noted, the fact that an active duty Marine Officer was involved in the program caused the Sergeant Major of the Marine Corps, its highest ranking non-commissioned officer and an advisor to the Commandant of the Marine Corps, to question the propriety of Bias' assignment. *See* AR at 12 (Email from Marine Corps Sergeant Major to subordinates asking "how can a LtCol be augmented back to active duty [to] be an instructor at a high school?").

24

Long-standing precedent in this Circuit has required "an 'unusually deferential application of the arbitrary and capricious standard' of the APA" to military decisions, including those that affect only personnel decisions and are not otherwise "operational, strategic or tactical" in nature.  *Roberts v. United States*, 741 F.3d 152, 158 (D.C. Cir. 2014) (quoting *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (1989)); *Piersall v. Winter*, 435 F.3d 319, 324 (D.C. Cir. 2006); *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000)).  This high degree of deference is warranted "to ensure that the courts do not become a forum for appeals by every [officer] dissatisfied with his or her ratings, a result that would destabilize military command and take the judiciary far afield of its area of competence."  *Mueller v. Winter*, 485 F.3d 1191, 1198 (D.C. Cir. 2007) (internal quotation marks and citation omitted; alteration in original).

At the same time, such deference does not cloak from review military personnel decisions that are otherwise deficient due, for example, to a failure to explain the decision sufficiently. *See, e.g., Kreis v. Sec'y of Air Force*, 406 F.3d 684, 688 (D.C. Cir. 2005) (remanding personnel decision since Air Force departed from prior practice in denying plaintiff's request for reconsideration); *Saint-Fleur v. McHugh*, No. 13-1019, 2015 WL 1209908, at *6 (D.D.C. Mar. 17, 2015) (finding military board of correction's decision was arbitrary and capricious in rejecting particular claim when only explanation for rejection was that claim at issue was "plainly frivolous"); *Poole v. Harvey*, 571 F. Supp. 2d 120, 126 (D.D.C. 2008) ("[B]ecause [the plaintiff's] argument to the ABCMR was non-frivolous and potentially meritorious and the ABCMR failed to address it, this court has no choice but to determine that the ABCMR's decision was arbitrary and capricious.").

The D.C. Circuit's recent decision in *Haselwander v. McHugh*, 774 F.3d 990 (D.C. Cir. 2014), is instructive.  In that case, the plaintiff sought correction of his military records and a

purple heart, which is awarded to Armed Forces members' wounded or killed in action,
stemming from his injury during a tour of duty in Vietnam.  *Haselwander*, 774 F.3d at 993–94.
Given the battlefield circumstances of his treatment, "those who attended to his wounds never
had a chance to fill out any medical paperwork for [the plaintiff and,] [a]s a result, [the
plaintiff's] Army records do not show that he was wounded in hostile action."  *Id.* at 991.
Despite "uncontested, creditable evidence" in the record confirming the plaintiff's wounds, the
Army Board for Correction of Military Records ("Board") denied his request, *id.* at 993, and
argued that this decision "should be upheld because he has no medical records of his injury and
treatment," *id.* at 992.  The Court found "that the Board's decision defies reason and is devoid of
any evidentiary support," characterizing the decision as "utterly illogical" and "patently unfair."
*Id.* at 992–93.  Pointing to record evidence confirming the plaintiff's wounds, the Court
concluded that the Board's decision, to the extent it was "based on the want of factual support for
the contention that [the plaintiff] was wounded in action or that he received medical attention,"
could not "be squared with the record" and was "stunningly myopic and devoid of reasoned
decisionmaking," *id.* at 999, requiring remand to the Board, *id.* at 1000.

It is unnecessary for this Court to determine whether the defendants' decision to decertify
the plaintiff is due the "unusually deferential application of the arbitrary and capricious standard
of the APA" that inheres to the military's operation decision making, *Roberts*, 741 F.3d at 158,
or standard arbitrary and capricious review under the APA.  Even under the "unusually
deferential application," *id.*, the defendants' actions may not "be squared with the record,"
*Haselwander*, 774 F.3d at 999, and must be vacated.

Indeed, the challenged decision in the instant case suffers from a similar flaw to the short-
sighted decisionmaking criticized in *Haselwander.*  In the instant matter, the TECOM

Commanding General explicitly did not consider "an important aspect of the problem" before him by disregarding the plaintiff's plausible, non-frivolous concerns that he was being singled out in retaliation for raising questions about Bias' appointment. *See Butte Cnty*, 613 F.3d at 194; *Am. Wildlands,* 530 F.3d at 997–98. Instead, the Commanding General deemed the plaintiff's concerns "collateral attacks," despite the fact that the record contained direct evidence that Stroman was searching for a reason to decertify the plaintiff in the face of the Commanding General's previous decision to reject Stroman's recommendation. AR at 32 (stating Stroman would make plaintiff his "science experiment," ensure the plaintiff received an "unsat eval" at the end of the year, and declaring the program would be "rid of" the plaintiff within fifteen months). Far from being a "collateral attack," the evidence submitted by the plaintiff regarding Bias and Stroman's motivations was at the heart of the relevant dispute: whether the plaintiff was being unfairly singled out and retaliated against through the decertification process.

The Commanding General's October 2014 letter made this failure to consider the plaintiff's evidence even plainer, accusing the plaintiff of engaging in conduct that called into question the plaintiff's "ability to accomplish the mission of the MCJROTC program by serving as an example of character and citizenship for MCJROTC students." 2SAR at 477. Rather than considering the possibility that the plaintiff's willingness to speak up about potential wrongdoing by Bias and Stroman was causing him to be subject to reprisals, the October 2014 letter held the mere fact that the plaintiff *raised* the allegations against him. *See id.* The defendants' apparent willingness to blind themselves to the plaintiff's concerns and accept the word of Stroman and Bias, when other evidence in the record makes plain that these officers were predisposed to decertify the plaintiff, renders the defendants' conclusion insufficiently explained for APA

purposes.  This willful blindness calls into significant question whether the decision arrived at by the defendants is objectively incorrect as well as procedurally unsound.

Since the defendants entirely failed to consider "an important aspect of the problem" before it by accepting Stroman and Bias' recommendations without considering the blatant predisposition and consequent bias in those recommendations, the defendants' decertification decision must be set aside as violative of the APA.  *See Am. Wildlands,* 530 F.3d at 997–98.[10]

## IV.   CONCLUSION

The record in this matter is replete with references to personality conflicts between Bias and Stroman on one side and the school principal and the plaintiff on the other.  The Court will not take sides in this conflict, but it will require the United States government, acting through the Marine Corps' TECOM Commanding General, not to turn a blind eye to obvious evidence of a potential retaliatory motive in those recommending the decertification of a Marine instructor whose service to his country on active duty and afterward has been generally unblemished.  The plaintiff's motion for summary judgment is granted and the defendant's motion for summary judgment is denied.  The Marine Corps' decisions denying the plaintiff's recertification requests are vacated and the defendants are ordered to reconsider their decision, taking into account the documented predisposition of Stroman and Bias in weighing the evidence before it.

An Order consistent with this Memorandum Opinion will issue contemporaneously.


Date: May 12, 2015


_____
BERYL A. HOWELL
United States District Judge

---

[10] Given the Court's vacatur and remand of the decertification decision based on the defendants' failure to consider evidence of bias in the record, it is unnecessary to address the plaintiff's additional arguments in favor of vacatur.